368 A.2d 616

Lois Harriett BARRETT

v.

Merle Edmund BARRETT, Appellant.

COMMONWEALTH of Pennsylvania

v.

Merle Edmund BARRETT, Appellant.

Supreme Court of Pennsylvania.

Argued Sept. 23, 1976.

Decided Jan. 28, 1977.

254

256

John B. Leete, Timothy P. O'Brien, Neighborhood Legal Services Assn., Aliquippa, for appellant.

Anthony J. Berosh, Asst. Dist. Atty., Beaver, for appellees.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY and MANDERINO, JJ.

## OPINION OF THE COURT

EAGEN, Justice.

These cases, consolidated at both the trial and appellate levels, raise important questions concerning the extent of a court's power to imprison for the contemptuous violation of support orders.

On August 5, 1965, one Lois Harriett Barrett filed a complaint seeking support in the Court of Common Pleas of Beaver County against her husband, Merle Edmund Barrett, under the Civil Procedural Support Law, Act of July 13, 1953, P.L. 431, § 1 *et seq.*, 62 P.S. § 2043.31 *et seq.* Subsequently, the parties entered into a written agreement stipulating that the husband would pay his wife the sum of $50 weekly toward her support and the support of their three minor children. This agreement was then incorporated into a court order. The parties were later divorced.

On February 2, 1971, Barrett pleaded guilty to being the father of a child born out of wedlock to one Lois Kookoothakis. On May 12, 1971, he was sentenced by the court to pay the lying-in expenses and $10 weekly toward the support of the child.

Although Barrett had a series of jobs, he seldom if ever voluntarily complied with either order, and, despite the fact that the support ordered in *Barrett v. Barrett* was eventually reduced to $25 per week, substantial arrearages accumulated in both cases. In two instances, his wages were attached. In March, 1974, he voluntarily

quit a 40-hour a week job paying $2.15 an hour at the Marriott Motor Inn in Greentree, Pennsylvania, because of what he termed "harassment" by the mothers of his children and the Beaver County Domestic Relations office of the Court of Common Pleas in attempting to collect the support that was due. In May, 1974, he moved with a "girl friend," one Pat McDanel, to Columbus, Ohio, where the two lived in a house trailer. Barrett did not inform Domestic Relations of his change of address, nor did he pay any support during his stay in Ohio. By June of 1975, the arrearages in *Barrett v. Barrett* amounted to $16,263.78 and those in *Commonwealth v. Barrett* were $2,363.83.

In May, 1975, Barrett returned to Pennsylvania for a visit and was taken into custody by the Beaver County authorities. He appeared in court without counsel and, on May 29, 1975, he was adjudged guilty of contempt and committed to jail until such time as he should purge himself by paying $500 on the arrearages in each case. Subsequently, counsel supplied by Neighborhood Legal Services entered an appearance on his behalf and petitioned the court to revoke the contempt orders. On June 6, the court did so, and Barrett was released from prison when Ms. McDanel posted an appearance bond for him in the sum of $1,000. On June 19, a rule to show cause why he should not be held in contempt for willfully violating the support orders was issued on Barrett. After a hearing on July 3, the court determined that probable cause to issue an attachment existed and doubled the bond requirement; when this requirement was not met, Barrett was recommitted to prison. On August 4, an evidentiary hearing was held after which, in an opinion and orders dated August 20, 1975, the court again found Barrett in contempt and ordered him imprisoned until he should pay a total of $500 in arrearages and post compliance bonds amounting to $500. The court also terminated the order of support with respect to Barrett's former

wife as of the date of the divorce and the support orders with respect to two of his children as of the dates of their attaining the age of 18, and set terms for future compliance. Barrett failed to purge himself of contempt and remained in prison.

Barrett petitioned both the trial court and the Superior Court for writs of supersedeas pending the disposition of his appeals, but he failed to meet the financial conditions imposed by these courts for supersedeas. He was, however, granted leave by the Superior Court to appeal in forma pauperis. On December 11, 1975, the Superior Court, with three judges concurring in result only, modified the orders of the trial court by limiting Barrett's imprisonment, should he fail to purge himself of the contempts, to two concurrent terms of six months each; the orders were otherwise affirmed. *Barrett v. Barrett*, 237 Pa.Super. 590, 352 A.2d 74 (1975). We granted allocatur.[1]

Appellant contends that he was financially unable to purge himself and that thus he should not have been imprisoned for civil contempt. He raises two issues for our consideration: (1) whether an indigent person who in the past willfully disobeyed support orders may now be imprisoned for civil contempt when he cannot purge himself of contempt due to his indigency, and (2) whether it is a violation of the Equal Protection Clause of the United States Constitution to imprison an indigent for civil contempt, his release conditional upon financial criteria, when the indigent has no economic means of complying with the court's order. We find, however, that the resolution of the equal protection issue is unnecessary to our disposition of these appeals; accordingly, we refrain from addressing ourselves to it.

1. Although Barrett's terms of imprisonment, as limited by the Superior Court, have expired, we do not regard these appeals as moot, since he remains subject to the orders of support and a failure to comply with them might again subject him to contempt proceedings.

260

■ Both the trial court and the Superior Court regarded the proceedings in question as proceedings in civil rather than criminal contempt, and in this they were undoubtedly correct. In determining whether a contempt proceeding is criminal or civil, a court must look to whether its dominant purpose is to punish for the violation of a court order or to coerce the contemnor into compliance with the order. It is well-settled that where the dominant purpose of the contempt proceeding is to aid a private litigant or interest rather than to vindicate the authority of the court or to protect the public interest, the contempt is civil. *Woods v. Dunlop*, 461 Pa. 35, 334 A.2d 619 (1975); *East Caln Township v. Carter*, 440 Pa. 607, 269 A.2d 703 (1970); *Brocker v. Brocker*, 429 Pa. 513, 241 A.2d 336 (1968), cert. denied 393 U.S. 1081, 89 S.Ct. 857, 21 L.Ed.2d 773 (1969); *Commonwealth ex rel. Beghian v. Beghian*, 408 Pa. 408, 184 A.2d 270 (1962); *Knaus v. Knaus*, 387 Pa. 370, 127 A.2d 669 (1956). Instantly, the contempt proceedings were held pursuant to section 9 of the Civil Procedural Support Law, 62 P.S. § 2043.39, the purpose of which law clearly is to provide a civil mechanism for effecting compliance with the duty of support. Accordingly, the trial court, after finding Barrett in contempt of its orders of support, imposed conditional sentences of imprisonment in order to coerce him into compensating his children for the arrearages accumulated in the past and providing the support due them in the future. The contempts thus were clearly civil. Cf. *Simmons v. Simmons*, 232 Pa.Super. 365, 335 A.2d 764 (1975).

■■ Furthermore, it is clear that even where the same facts might give rise to criminal as well as civil contempt, each has its own distinct procedures and confers distinct procedural rights; the two may not be casually commingled. *Philadelphia Marine Trade Association v. International Longshoremen's Association*, 392 Pa. 500, 140 A.2d 814 (1958). Thus, even if Barrett's

noncompliance with support orders was cognizable as criminal contempt, a strictly penal sanction could only have been imposed in a proceeding marked by the essential procedural safeguards of the criminal law and in accordance with statutory provisions. See *In re Martorano*, 464 Pa. 66, 346 A.2d 22 (1975); *Commonwealth v. Abrams*, 461 Pa. 327, 336 A.2d 308 (1975); *Commonwealth v. Mayberry*, 459 Pa. 91, 327 A.2d 86 (1974); Act of June 16, 1836, P.L. 784, § 23 *et seq.*, 17 P.S. § 2041 *et seq.*; Act of June 23, 1931, P.L. 925, §§ 1–2, 17 P.S. §§ 2047–48. *A fortiori*, this would have been so had the instant proceeding been to punish Barrett for the substantive crime of nonsupport. See 18 Pa.C.S.A. §§ 4321–22; Act of May 24, 1917, P.L. 268, § 1, *as amended*, 19 P.S. § 1151. Such was not the case instantly.

■ Section 9(b) of the Civil Procedural Support Law, supra, provides in pertinent part that "any wilful failure to comply with any order of the court may be deemed a contempt of court and . . . may be punishable by the court by commitment to the county jail or house of correction." On this record, there can be no question there was ample evidence, much of it in Barrett's own testimony, that continually and continuously he had willfully failed to comply with the court's support orders. Cf. *Commonwealth ex rel. Wright v. Hendrick*, 455 Pa. 36, 312 A.2d 402 (1973). On direct appeal, the Superior Court regarded Barrett's long history of willful nonsupport as decisive and stated:

"He was imprisoned for willfully violating court orders with which he was fully capable of complying when the orders were entered. The fact that appellant may be indigent at present has no bearing on his failure to support his wife and children when he was able. Were we to agree with appellant's belief that no indigent may be imprisoned for civil contempt by willfully failing to support his dependents, even though the indigency was voluntarily created, the courts of the

Commonwealth would lose all power to enforce support orders. We will not so hold."

237 Pa.Superior Ct. at 596, 352 A.2d at 77. In so stating, the Superior Court confused the coercive and prospective function of imprisonment in civil contempt with criminal punishment for past acts and thus fell into error.

■ As we have previously stated in reference to the civil contempt power: "The use of the power to enforce compliance is exercised with the objective of compelling performance and not inflicting punishment." *Commonwealth ex rel. Beghian v. Beghian,* supra, 408 Pa. at 414, 184 A.2d at 272. In accordance with this principle, we have indicated that a court may not convert a coercive sentence into a punitive one by imposing conditions that the contemnor cannot perform and thereby purge himself of the contempt. *In Re Martorano,* supra; *Knaus v. Knaus,* supra. See and compare *Shillitani v. United States,* 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); *Riccobene Appeal,* 439 Pa. 404, 268 A.2d 104 (1970). In *Martorano,* supra, we made it clear that the coercive imprisonment of one who has contemptuously refused to testify before a grand jury cannot extend beyond the term of that grand jury; in *Knaus,* supra, we held that one who ignored a court order that he cease prosecuting a divorce action in Arkansas could not be imprisoned for civil contempt after the Arkansas decree became final because he had no means of purging himself. It is plain, therefore, that in determining whether Barrett was properly imprisoned for civil contempt, the crucial question is not whether he willfully and contemptuously violated the original orders, but whether he had the present ability to comply with the conditions set by the court for purging himself of his contempt. Although a determination of "present ability" may present a more difficult evidentiary problem in this sort of case than in *Martorano* or *Knaus,* we do not believe that any greater

justification is here presented for imposing a coercive imprisonment subject to conditions with which compliance is impossible.[2] Cf. *Maggio v. Zeitz*, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948).

Our inquiry, however, is not at an end, since the trial judge, unlike the Superior Court, did not here merely assume that Barrett was indigent and without the present ability to comply. Rather, he refused to believe Barrett's testimony of indigency and set conditions for purging himself of contempt with which he believed Barrett capable of complying. Thus, the district attorney as appellee argues that appellant has failed to meet his burden of proof as to his financial inability to comply. We must therefore determine whether under the circumstances the conditions imposed by the trial court to coerce Barrett into compliance were warranted.

Although we have discovered no Pennsylvania cases which have passed directly on the point, the general rule is that in civil contempt proceedings the burden is on the complaining party to prove noncompliance by a preponderance of the evidence, but that present inability to comply is an affirmative defense which must be proved by the alleged contemnor. See, e. g., *In Re S.L. T.*, 180 So.2d 374 (Fla.Dist.Ct.App.1965); see generally Annot., 53 A.L.R.2d 591 (1957); D. Dobbs, Contempt of Court: A Survey, 56 Cornell L.Rev. 183, 265–67 (1971) [Dobbs]. We now hold, however, that where, as here, the court in civil proceedings finds there has been willful noncompliance with its earlier support orders constitut-

2. See and compare the following cases from other jurisdictions which take the position that present inability to comply is a defense to civil contempt proceedings of this nature: *Scott v. Scott*, 127 U.S.App.D.C. 245, 382 F.2d 461 (1967); *Schultz v. Helm*, 368 F.Supp. 423 (E.D.Wis.1973), aff'd, 506 F.2d 1404 (7th Cir. 1974); *Sword v. Sword*, 59 Mich.App. 730, 229 N.W.2d 907 (1975); *Sodones v. Sodones*, 366 Mass. 121, 314 N.E.2d 906 (1974); *Muery v. Muery*, 46 Ala.App. 617, 247 So.2d 123 (1971); *Truslow v. Truslow*, 212 A.2d 763 (D.C.App.1965); *Lopez v. Lopez*, 148 Colo. 404, 366 P.2d 373 (1961).

ing contempt but the contemnor presents evidence of his present inability to comply and make up the arrears, the court, in imposing coercive imprisonment for civil contempt, should set conditions for purging the contempt and effecting release from imprisonment with which it is convinced *beyond a reasonable doubt*, from the totality of the evidence before it, the contemnor has the present ability to comply. Since to condition a person's avoidance of or release from imprisonment on his performing acts beyond his power to perform is in effect to convert a coercive sentence into a penal one without the safeguards of criminal procedure, we are of the opinion that the stricter evidentiary standard of the criminal law should apply with regard to the issue of present ability. See *Maggio v. Zeitz*, supra (separate opinion, Black, J.); *Robertson v. State*, 20 Ala.App. 514, 104 So. 561 (1925). Cf. *Commonwealth v. Rose*, 457 Pa. 380, 321 A.2d 880 (1974). See also Dobbs, supra at 265–67.

Moreover, since in a case of this sort the complaining party is seeking not a penal sanction but the support that is due, to imprison the contemnor without sufficient evidence of his present ability to comply when the issue is properly raised is to thwart the purpose of the Civil Procedural Support Law and make it even more difficult for the complaining party to obtain the relief sought. Cf. *Philadelphia Marine Trade Association v. International Longshoremen's Association*, supra. Clearly, if the contemnor presently lacks the resources to fulfill his duty of support, he is not likely to obtain them while languishing in prison. See *Gossett v. Gossett*, 34 Tenn.App. 654, 241 S.W.2d 934 (1951). Thus the justification for imprisonment in civil contempt cases ceases if such imprisonment can have no coercive effect, and imprisonment under such circumstances is an abuse of the court's discretionary power in civil contempt.[3]

3. Since a proceeding in civil contempt remains essentially civil, despite the quasi-criminal element of possible imprisonment, our

In the instant cases, the trial judge after the evidentiary hearing set the payment of $500 in arrearages and the posting of compliance bonds amounting to another $500 as the conditions whereby Barrett might purge himself of contempt and be released from imprisonment. He thus did not require the immediate payment of the entire amount due, which from the evidence would have been plainly impossible, but attempted instead to set conditions with which he believed Barrett could comply. We nevertheless conclude that on this record there was insufficient evidence that Barrett had the present financial ability to comply with the contempt orders and avoid imprisonment.

Barrett's testimony as to his financial situation, which was essentially uncontradicted but also uncorroborated, was that after voluntarily leaving his job at the Marriott Motor Inn he was supported by Ms. McDanel, who had a job managing a beauty shop in Columbus, except for the sum of $150 per month which he was paid in cash by Ms. McDanel for cleaning the beauty shop managed by her and another shop in the same chain; he stated that he contributed about 80% of this money to the couple's food and rental expenses and retained the rest for personal expenses. He testified that this employment was lost to him when he was unable to return to Ohio but that his girl friend had told him of the possibility of his obtaining employment as a welder.[4] He further testified that, aside from his clothing, his only assets were a 1964 Oldsmobile worth $25 as junk and an unspecified account containing about $70; he stated that a 1968 Ford (no testimony as to value), though registered in his name,

rules of civil discovery are applicable and should be freely employed to aid the complaining party in attempting to prove the alleged contemnor's present ability beyond a reasonable doubt.

4. A case worker in the Domestic Relations office testified that Barrett had said nothing to her about his beauty-shop employment but had indicated only that he did odd jobs in Ohio such as washing dishes.

actually belonged to Ms. McDanel. He indicated that while in Ohio he had not applied for public assistance or contacted the employment office, but that he had independently searched for additional employment.

The trial judge, not without justification, found Barrett an unreliable witness and was unwilling to accept his testimony as to his present financial condition. He also noted that Ms. McDanel, who had an apparently well-paying job, had earlier posted a $1,000 appearance bond for Barrett. The judge in his opinion cited *Commonwealth ex rel. Travitzky v. Travitzky,* 230 Pa.Super. 435, 326 A.2d 883 (1974) for the proposition that the trial court is not bound by the testimony of a witness as to the financial resources available to him. *Travitzky,* however, merely held that a divorced wife seeking additional support was entitled to rebut her former husband's testimony by ascertaining the amount his second wife was contributing to the family's expenses, not that the court could, as the basis for coercive imprisonment, make a finding of a husband's present resources without support in the record other than the husband's lack of credibility.[5] *Travitzky* also held that a second wife has no duty to support her husband's children by his first wife; *a fortiori* this would be true of Ms. McDanel, who also had no duty to support Barrett. And even assuming it were proper to consider Ms. McDanel's assets in setting the terms of Barrett's coercive sentences because she had posted the earlier bond, it should be noted that

5. In *Commonwealth to use of Messer v. Mickelson,* 196 Pa.Super. 464, 175 A.2d 122 (1961) and *Commonwealth ex rel. Litz v. Litz,* 190 Pa.Super. 310, 154 A.2d 420 (1959), contempt convictions *were* affirmed by the Superior Court, although in both cases the husband's testimony as to his present assets was uncontradicted by another witness. In those cases there appears to have been *no specific consideration of the distinction between civil and* criminal contempt or of the evidentiary standards appropriate to contempt proceedings; those cases are also perhaps distinguishable from the present ones in that in each of them the husband's own testimony strongly suggested that he had available to him and had concealed sufficient assets to satisfy his obligations.

she did not post the higher bond which was subsequently set by the court and that Barrett remained in prison. Hence, although we conclude that the findings of contempt were warranted, we must also conclude there was insufficient evidence that Barrett had the present ability to comply with the conditions set by the court for purging himself; his commitment in civil contempt was therefore improper.

 We emphasize that our decision today does not question the judicial power, under appropriate procedures, to impose criminal penalties for nonsupport;[6] we are here concerned only with the necessary limitations on the power to impose coercive imprisonment as a sentence for civil contempt. Nor do we hold that under no circumstances may an indigent be imprisoned for civil contempt, only that the conditions imposed for purging himself must be within his apparent power to perform. The mere fact that the alleged contemnor has previously left the jurisdiction and may do so again confers no greater authority to convert civil proceedings and sanctions into criminal ones. See *Commonwealth ex rel. Beghian v. Beghian,* supra. We note, however, that both Pennsylvania and Ohio have adopted the Uniform Reciprocal Enforcement of Support Act, which establishes procedures for interstate cooperation with respect to both civil and criminal enforcement of support orders.[7]

The order of the Superior Court is reversed, and the cases remanded to the trial court for further proceedings consistent with this opinion.

6. We thus express no view as to whether punishing an indigent criminally for nonsupport by imprisonment might violate his right to equal protection. See and compare *Tate v. Short,* 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971); *Williams v. Illinois,* 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970).

7. See Act of December 6, 1972, P.L. 1365, No. 291, § 42 *et seq.,* 62 P.S. § 2043—1 *et seq.* (Supp.1976–77); Ohio R.C. § 3115.01 *et seq.*

268

NIX, J., did not participate in the consideration or decision of this case.

MANDERINO, J., joins in this opinion and filed a concurring opinion.

MANDERINO, Justice (concurring).

Although I join in the majority opinion, I would like to make one further comment. The Pennsylvania Constitution provides that: "The person of a debtor, where there is not strong presumption of fraud, shall not be continued in prison after delivering up his estate for the benefit of his creditors in such manner as shall be prescribed by law." Constitution, Article I, Section 16. A money judgment resulting from a support order should, in my opinion, be treated as any other money judgment. If the defendant has assets against which such a money judgment can be enforced, the plaintiff may proceed as in any enforcement action. See generally Pa.R.C.P. Rule 3101, et seq. Therefore, unless the non-support defendant wilfully conceals assets in order to avoid execution of the money judgment, he or she should not be subjected to the sanction of imprisonment. To do so violates Art. I, Section 16.